[No. 11510.   Department Two.   January 17, 1914.]

Manhattan Company, Incorporated, *Respondent*, v.
United States Fidelity & Guaranty Company,
*Appellant*.[1]

Principal and Surety — Release of Surety — Overpayments—
Prejudice.   A compensated surety on a building contract is not
prejudiced, and is therefore not released, by payments made dur-
ing the progress of the work in excess of the amounts due the con-
tractor, where they were necessary to protect the property from lien
claims of laborers, the amounts of which were not questioned; nor by
a small excess payment which was less than a credit afterward
given for extra work.

Same—Release of Surety—Taking Over Work.   The payment of
laborers on a building when the contractor was unable to pay them,
is not a taking over of the work, where it was simply to protect
the building from labor liens and the contractor was allowed to go
on with the work.

Appeal from a judgment of the superior court for King
county, Humphries, J., entered May 24, 1913, upon findings
in favor of the plaintiff, in an action on contract, tried to
the court.   Affirmed.

*McClure & McClure*, for appellant.
*Holzheimer & Herald*, for respondent.

Parker, J.—This is an action upon a surety bond, exe-
cuted by the defendant O. W. Lindsley as principal, and the
defendant The United States Fidelity & Guaranty Company
as surety, to secure the faithful performance of a building
contract on the part of Lindsley.   A trial before the court
without a jury resulted in findings and judgment in favor
of the plaintiff against both defendants, from which the de-
fendant Guaranty Company has appealed.

On March 16, 1912, the defendant Lindsley entered into
a contract, in writing, with respondent, Manhattan Company,

[1]Reported in 137 Pac. 1003.

whereby he agreed to furnish all labor for, and to perform certain specified portions of the work of constructing, a building then in course of construction by respondent in Seattle. The portions of the contract we are here concerned with read as follows:

"Art. V. Should the contractor at any time refuse or neglect to supply a sufficiency of properly skilled workmen, or of materials of the proper quality, or fail in any respect to prosecute the work with promptness and diligence, or fail in the performance of any of the agreements herein contained, such refusal, neglect or failure being certified by the architect, the owner shall be at liberty, after three days' written notice to the contractor, to provide any such labor or materials, and to deduct the cost thereof from any money then due or thereafter to become due to the contractor under this contract; and if the architect shall certify that such refusal, neglect or failure is sufficient ground for such action, the owner shall also be at liberty to terminate the employment of the contractor for the said work and to enter upon the premises and take possession, for the purpose of completing the work included under this contract, of all materials, tools and appliances thereon, and to employ any other person or persons to finish the work, and to provide the materials therefor; and in case of such discontinuance of the employment of the contractor he shall not be entitled to receive any further payments under this contract until the said work shall be wholly finished, at which time, if the unpaid balance of the amount to be paid under this contract shall exceed the expense incurred by the owner in finishing the work, such excess shall be paid by the owner to the contractor; but if such expense shall exceed such unpaid balance, the contractor shall pay the difference to the owner."

"Art. IX. It is hereby mutually agreed between the parties hereto that the sum to be paid by the owner to the contractor for said work and labor shall be common brick five and no-100 ($5.00) dollars per M., kiln count—press brick and arch brick, fifteen and no-100 ($15.00) dollars per M., kiln count—setting stone and cast iron plates, seventy-five and no-100 ($75.00) dollars. If arch brick ought to be cut an additional sum of ten and no-100 ($10.00) dollars per arch will be paid to party of first part by party of the sec-

ond part, subject to additions and deductions as hereinbefore provided, and that such sum shall be paid by the owner to the contractor, in current funds and only upon certificates of the architect as follows: Eighty-five (85) per cent to be paid as work progresses on weekly payments.

"Party of the first part must show receipts for all labor at the time each payment is made.

"The final payment shall be made within fifteen (15) days after the completion of the work included in this contract, and all payments shall be due when certificates for the same are issued.

"If at any time there shall be evidence of any lien or claim for which, if established, the owner of the said premises might become liable, and which is chargeable to the contractor, the owner shall have the right to retain out of any payment then due or thereafter to become due an amount sufficient to completely indemnify them against such lien or claim. Should there prove to be any such claim after all payments are made, the contractor shall refund to the owner all moneys that the latter may be compelled to pay in discharging any lien on said premises made obligatory in consequence of the contractor's default."

Thereafter, on March 18, 1912, the bond here involved was executed by Lindsley and the Guaranty Company, as principal and surety, respectively, in the sum of $1,000, to secure the faithful performance of the contract on the part of Lindsley, which bond contains, among other things, the following:

"Now therefore, the conditions of the foregoing obligation is such that if the said principal shall well and truly indemnify and save harmless the said obligee from any pecuniary loss resulting from the breach of any of the terms, covenants and conditions of the said contract on the part of the said principal to be performed, then this obligation shall be void; otherwise to remain in full force and effect in law;

"Provided, however, that this bond is issued subject to the following provisions:

"First: That no liability shall attach to the surety hereunder unless, in the event of any default on the part of the principal in the performance of any of the terms, covenants or conditions of the said contract, the obligee shall promptly,

and in any event not later than thirty days after knowledge of such default, deliver to the surety at its office in the city of Baltimore written notice thereof, with a statement of the principal facts showing such default and the date thereof; nor unless the said obligee shall deliver written notice to the surety at its office at city of Seattle, Wn. and the consent of the surety thereto obtained, before making to the principal the final payment provided for under the contract herein referred to.

"Second: That in case of such default on the part of the principal, the surety shall have the right, if it so desires, to assume and complete or procure the completion of said contract; and in case of such default, the surety shall be subrogated and entitled to all the rights and properties of the principal arising out of said contract and otherwise, including all securities and indemnities theretofore received by the obligee and all deferred payments, retained percentages and credits, due to the principal at the time of such default or to become due thereafter by the terms and dates of the contract."

On April 13, 1912, Lindsley commenced work under the contract. On April 20, the respondent paid to Lindsley $100, which was $60 in excess of the amount then due him under the terms of the contract. On April 27, respondent paid to Lindsley $295, which was $58.50 in excess of the amount then due him under the terms of the contract after deducting the excess theretofore paid. On May 3, respondent paid to Lindsley $270, which was somewhat in excess of the amount then due him under the terms of the contract after deducting excess payments theretofore made. The amount Lindsley was then overpaid is not made plain by the evidence, though we assume that, if the work progressed substantially as during the previous week, the excess payment was but a very small amount. The reason for the excess in the first payment is not shown. The excess in the second and third payments appears to have been to enable Lindsley to pay his workmen. In any event, it seems plain that all the money of the second and third payments was used in paying wages of workmen employed by Lindsley upon

the building.  On May 11, Lindsley being unable to pay his workmen, they were paid direct by respondent, the amount so paid being $543.80.  This was somewhat in excess of the amount then due Lindsley under the terms of the contract, though to what extent we are not informed.  On May 18, Lindsley being again unable to pay his workmen, they were paid direct by respondent, the total amount so paid being $681.80.  This was $523 in excess of the amount then due Lindsley under the terms of the contract.  On that day, respondent duly notified appellant Guaranty Company of this payment and of the amount of the excess, stating in the notice, among other things, the following:

"O. W. Lindsley has notified us of his inability to pay the amount of wages due to his employees upon said work, and said employees have made to us claims and demands for such wages and have threatened to file liens therefor.

"Pursuant to the terms of said contract, you are notified that we have retained out of any payment due or to become due to said contractor under said contract, and have advanced sufficient money to pay and have paid to said employees the full amount of their said claims for said labor."

On May 24, Lindsley being again unable to pay his workmen, they were paid direct by respondent, the amount so paid being $458.40.  This also was in excess of the amount then due Lindsley under the terms of the contract.  On June 1, Lindsley being again unable to pay his workmen, they were paid direct by respondent, the amount so paid being $479.90.  This was also in excess of the amount then due Lindsley under the terms of the contract.  On June 8, Lindsley's workmen were paid direct by respondent for the same reason, the total sum of $90.75.  This also was in excess of the amount then due Lindsley under the terms of the contract.  Immediately following each of these payments made to Lindsley's workmen after May 18, appellant Guaranty Company was duly notified thereof, in substance as it was notified on May 18, of the payment to Lindsley's workmen on that date.  On June 10, Lindsley abandoned the

work.  On June 11, respondent duly notified appellant Guaranty Company of Lindsley's abandonment of the work.  That notice, among other things, contained the following:

"You are further notified that pursuant to the terms of said contract, by reason of the abandonment of said work by said contractor, unless provisions are made by you to complete said work within three days from date hereof we will take possession of said premises and complete said work, and hold said contractor and you upon your bond for the difference between the cost of said work and the contract price."

On June 17, appellant Guaranty Company having failed to take any steps looking to the completion of the performance of Lindsley's contract, respondent took charge of the work and completed it.  It seems plain from the record before us that it was necessary for respondent to make all the payments to Lindsley's workmen which we have noticed, in order to protect the property from liens of the workmen. It does not seem to be seriously contended that the amounts thus paid were not due the workmen or that the workmen were not claiming and entitled to have liens upon the building as security therefor.  The amount which respondent thus paid to Lindsley and his workmen in excess of the amount Lindsley would have earned under the contract was $1,655.87. From this there was, by the court, deducted $115, due from respondent to Lindsley for work which he had performed outside of that included in his contract, and judgment was rendered against Lindsley for the balance of $1,540.87, and against appellant Guaranty Company for $1,000, the amount of the bond upon which it was surety.

The principal contention of counsel for appellant is that it was released from all obligation under the bond because of these payments made by the respondent to Lindsley and his workmen.  This contention is rested upon the general rule, recognized and announced by this court in *Peters v. Mackay*, 20 Wash. 172, 54 Pac. 1122, that the surety is released where the payments to the contractor are in excess of the

amounts provided for under the contract. In that case, apparently, the court took no notice of the exceptions to this rule, nor did it give any attention to what extent the rule might be regarded as modified in applying it to payments made which did not work to the prejudice of the surety. It is also worthy of note that, in that particular case, the surety was manifestly not a paid surety as in this case. In the later case of *Leghorn v. Nydell*, 39 Wash. 17, 80 Pac. 833, the court had under consideration a state of facts which did involve an exception to the rule announced in *Peters v. Mackay;* that is, a situation where the payments were without prejudice to the rights of the surety. It was there said:

"The next objection urged is that the respondent paid the contractor the sum of $300 at a time when the same was not due or payable under the terms of the contract. The facts in relation to this payment are these: The payments were due in installments under the contract, and were to be made on certificates of the architect. The first certificate was given July 10, 1902; the second, August 20, 1902; the third, September 5, 1902; and the fourth, November 11, 1902; and the payments were made on or about the same dates. On September 15, 1902, the respondent loaned or advanced to the contractor the sum of $150, and a like amount on September 25, 1902. These amounts were repaid or deducted from the last certificate of November 11, 1902. Whether this was a loan, as claimed by the respondent, or an advancement under the contract, as claimed by the appellant, is wholly immaterial. The money was used by the contractor in the construction of the building, and the appellant was benefited rather than prejudiced by the irregular payments."

The view that overpayments not resulting in prejudice to the surety will not discharge its obligation, also finds support in *Monro v. National Surety Co.*, 47 Wash. 488, 92 Pac. 280, and *Black Masonry & Contracting Co. v. National Surety Co.*, 61 Wash. 471, 112 Pac. 517. In *Leiendecker v. Aetna Indemnity Co.*, 52 Wash. 609, 101 Pac. 219, relied upon by counsel for appellant, the contractor was paid his entire contract price before work upon the building was

even commenced, without the knowledge of the indemnity company, while the bond, by its very terms, expressly required that he should reserve payment "until the expiration of the time within which liens or notices of liens may be filed." It was, of course, rightly held in that case that full payment before the commencement of the work discharged the surety. In *Black Masonry & Contracting Co. v. National Surety Co., supra*, relied upon by counsel for appellant, the owner paid the contractor $3,500 upon a $16,500 contract before anything whatever was due the contractor thereon. The substance of the holding in that decision was that there was such a substantial change, or rather, violation, of the terms of the contract as to release the surety, in view of the provisions of the contract for payments only after the stone had actually been placed in the building, there being no stone placed in the building at the time of the $3,500 payment. That case also differs from this in that the payment was made direct to the contractor and not to those who may have had liens upon the building. Nor does it appear with certainty that the money paid the contractor was ever used by him in paying for labor or material used in the building. Nor does it appear that such payment was necessary to relieve the building from lien claims. In the case before us, all payments made after the third payment were made direct to workmen who had valid lien claims upon the building, the amount and validity of which are not questioned. Article 9 of the contract above quoted, it seems to us, clearly gave to respondent the right to protect the building from these liens by paying the same and charging the amounts so paid against Lindsley, even though the required amount was larger than the amount due Lindsley at the time of payment. We do not think that this was a change or violation of the terms of the contract between respondent and Lindsley for the faithful performance of which the bond was given.

The first, second and third payments made by respondent

direct to Lindsley, it seems plain, at no time resulted in Lindsley being overpaid to exceed $100. This small overpayment, it seems. to us, in view of the quantity of work to be performed under the contract, the fact that these overpayments occurred so early in the work, and the fact that Lindsley was thereafter given credit for $115 for work which he did for respondent entirely outside of that specified in the contract, should not be held to be a material change or violation of the terms of the contract. We are unable to see that these payments resulted to the prejudice of appellant.

Some contention is made on behalf of appellant that it was discharged from liability. under the bond because respondent's action in paying Lindsley's workmen on May 11 and following was, in substance, a taking over of the work from Lindsley by respondent. We cannot agree with this contention. It seems apparent that respondent was doing nothing more than protecting itself against the liens of Lindsley's workmen. Lindsley continued with the work with every appearance of an intention to complete it for a considerable time thereafter, and after appellant was notified of respondent's paying Lindsley's workmen and of the necessity therefor. We think this did not have the effect of taking over the work by respondent without due notice to appellant.

We are of the opinion that the judgment should be affirmed. It is so ordered.

CROW, C. J., FULLERTON, MOUNT, and MORRIS, JJ., concur.